PAUL THOMPSON AND OLETA THOMPSON, HUSBAND AND WIFE, APPELLANTS, *v.* WALTER E. HERRMANN AND FERN E. HERRMANN, HUSBAND AND WIFE, RESPONDENTS.

No. 7324

January 29, 1975                    530 P.2d 1183

*Robert A. Grayson,* of Carson City, for Appellants.

*Carl F. Martillaro* and *Arthur Bayer,* of Carson City, for Respondents.

64

## OPINION

By the Court, Mowbray, J.:

Walter E. Herrmann and his wife, Fern, filed a complaint in district court against Paul and Oleta Thompson, seeking specific performance or, in the alternative, damages resulting from an alleged breach of contract between the Herrmanns and the Thompsons, wherein Paul Thompson agreed to construct a small dam and reservoir for the Herrmanns in Lyon County. The Thompsons answered the complaint, and they filed a counterclaim, wherein they sought, in alternative causes of action, damages for breach of contract, fraud, unjust enrichment, and quantum meruit. The district judge found in favor of the Herrmanns and awarded them damages in the sum of $77,000, from which judgment the Thompsons have appealed.

1.   In January 1970, the Herrmanns agreed to lease to the Thompsons their ranch in Lyon County. The term of the lease was for 7 years. The Thompsons agreed to pay a certain annual rental and to make designated leasehold improvements on the property, including the construction of an irrigation dam and reservoir in El Dorado Canyon. This lease agreement was superseded by a later one, executed by the parties in December 1971, wherein among other things the Thompsons agreed to commence construction and complete the dam before March 7, 1972.[1]

The Herrmanns agreed to execute a grant deed conveying to the Thompsons 115 acres of their property, which deed was to be placed in escrow and to be delivered to the Thompsons 45 days after notice of completion of the dam had been recorded, provided that all liens validly recorded within the time prescribed by statute had been satisfied.[2] The agreement also

---

[1] The agreement, in paragraph 6, provided as follows:

"6.   That the completion schedule of the said dam shall be as follows:

"a.   December 14, 1971—level fill compacted above pipe = 45'
"b.   January 1, 1972—level fill compacted above pipe = 60'
"c.   February 7, 1972—all dirt in place
"d.   March 7, 1972—construction of dam completed."

[2] The escrow instructions provided in part:

"Walter E. Herrmann and Fern E. Herrmann may, prior to the expiration of 45 days after notice of completion has been recorded, substitute the sum of $90,000 for the Grant Deeds herein referred to. In the

provided: "The construction of said dam shall be under the supervision of and constructed in a manner satisfactory and acceptable to Walter Reed [sic], who shall be compensated by the Parties of the Second Part [the Thompsons] for any expenses incurred from January 1, 1970 to completion, and be acceptable to the State Engineer, so as to satisfy the requirements of Permit Number 23729. Upon Walter Reed [sic] and the State of Nevada accepting the dam as being completed, it shall be complete and a notice of completion shall be recorded in Carson City and Lyon County by Paul Thompson."

Paul Thompson commenced construction of the dam, following the plans previously drafted by Walter Reid, who on occasion checked the progress of the work. Work continued until January 1972, when it was stopped by the Nevada State Engineer. Starr Hill, Jr., an engineer with the State, testified that construction was stopped because the application for the permit which Mr. Reid had filed with the Division of Water Resources had never been finally approved. After negotiations with the State, Mr. Reid's plans were amended, and approval to proceed was given by the State.[3]

It was at this time that Paul Thompson abandoned the project and returned to his home in California. Starr Hill, Jr., Surface Water Engineer with the State, demanded in March 1972 that Mr. Herrmann either proceed with a firm schedule of construction of the dam or remove what had been done by Paul Thompson.[4]

---

event of such substitution, you are instructed to deliver to Paul Thompson and Oleta Thompson sums in the same proportion and under the same terms as the distribution of the land above described."

[3]Two articles were added to Mr. Reid's initial specifications:

"ART. 8, RIP RAP

"The sizing of the riprap placed on the upstream embankment will conform with the specifications in 'Design of Small Dams,' page 207.' [sic].

"ART. 9, FILTER BLANKET DRAIN

"The sizing of the material placed in the filter blanket drain will conform to the Sharp-Crater test results of February 10, 1972, of sample submitted from dam site (T–210–40)."

[4]Mr. Hill's letter stated, in part:

March 23, 1972

Mr. W. E. Herrmann
Rt. 1, Box 564
Vacaville, California    95688

Dear Mr. Herrmann:

A field investigation of Eldorado Canyon Dam on March 20, 1972, by personnel of this office determined that all construction at the dam site had ceased and all equipment except one junked D8 Cat had been

The Hermanns then engaged the Worthington Construction Company of Elko, Nevada, to complete the project. Two of the changes required by the State included a filter blanket and the approval of a natural or constructed keyway at the bottom of the dam. In order to approve the keyway, it was necessary to inspect the bedrock beneath the dam, which required removal of certain compact material. When the removal was commenced, it was discovered that the fill provided by Thompson included large boulders, pine trees and trunks, plus sagebrush, which, of course, were not specified in the plans Reid had furnished Thompson.[5] As a result, it was necessary to remove all the compact fill and start from the beginning to build the dam.[6] Mr. Walter Reid, upon direct examination by Mr. Martillaro,

---

removed from the site. The outlet pipe was of ample capacity to carry present stream flow through the partially constructed dam.

Please be informed that you have until three months from the date of this letter in which to continue construction of the dam. The partially constructed dam is, at present, an obstruction in the stream channel. If construction has not continued by June 23, 1972, it will be necessary for you to have the partially constructed dam completely removed from the channel to eliminate any hazard it may create down stream.

> Sincerely,
>
> Starr Hill Jr.
> Starr Hill, Jr.
> Surface Water Engineer

[5]Article 1 of the Specifications stated in part:
"ART. 1, EARTH EMBANKMENT

"...

"b. Fill Material:

"(1) The borrow for the material for the fill may be taken from either side of the dam site upstream of the dam.

"(2) All roots, stumps, humus and vegetable matter shall be removed from the fill material.

"(3) All rocks larger than six inches (6") in diameter shall be excluded from the upstream two thirds (⅔) of the dam and may be placed in the downstream one third (⅓) if not so large as to interfere with getting the proper compaction."

[6]Mr. Ralph Walter Herrmann, Mr. Herrmann's son, upon direct examination by Mr. Martillaro, testified:

"Q None of the construction that was in place could be used?

"A Correct.

"Q Why was that?

"A Because of non-compaction, because of trees found in the middle of the dam, brush, boulders, boulders larger than yourself, because of pipe that was run through the dam that was only encased in concrete on the top and that leaked in the middle. The bottom of the area was

testified that Thompson had failed to follow his plans and specifications and that the work was completely defective.[7]

totally unsatisfactory. Water would run through there. In fact, one time we thought we had a problem with a spring in the middle of the dam, and we found out that it was just a leak in the pipe.

"Q  In other words, you just had to start from scratch?

"A  Yes.

"Q  Everything had to come out?

"A  Yes."

[7]Mr. Walter G. Reid, engineer, upon direct examination by Mr. Martillaro, testified:

"Q  What else did you find?

"A  We found that the gravel had been left in there, and so the water was seeping through as far back as the last rock ledge, which seemed to have sealed up—sealed that off all right, but it left water coming through. It was when we dug down that we discovered this.

"Q  And was that in violation of the plans and specifications?

"A  Yes.

It was all loose material, and it was supposed to be removed. Then we found as we went—Of course, we discovered that the pipe wasn't jacketed, and then we had to take out all of the material on either side. We knew we had to take it out as we went down or excavate it as we went down. We found pockets of rocks and brush and gravel that had been pushed in there.

"Q  Now, when you are speaking about that, what were the size of rocks that were supposed to be—the largest size that was permitted under the plans and specifications?

"A  The specifications called for everything above six inches to be removed. From the center part or up stream—The upper two thirds could be coarse material to a certain extent. But in the portion that we call the "main" or "impervious" portion everything above six inches was supposed to be removed.

"Q  And what did you discover there?

"A  There were many rocks that were two and three feet in diameter.

"Q  And even larger than that?

"A  Yes.

"Q  How about other debris?

"A  Well, we found some stumps and parts of trees as well as brush and—

"Q  And that was not supposed to be there according to the plans and specifications?

"A  No. This would cause failure in the dam because the trees would rot in time and, of course, leave a void.

"Q  In your professional opinion as an engineer, Mr. Reid, all of the construction work that was in place or placed there by Mr. Thompson had to be removed; is that correct?

"A  Yes.

"Q  And that was because of the failure to follow the plans and specifications?

"A  Right."

2. The district judge found, and correctly so, that Thompson's performance was so inadequate and his work so defective that he was barred from any recovery under the agreement of the parties. As the Colorado court said in Little Thompson Water Ass'n v. Strawn, 466 P.2d 915, 917 (1970):

". . . The rules appear to be that if the promisor proves complete and full performance, he is entitled to recover the complete and full consideration bargained for; if the proof establishes something less than full and complete performance, that is, substantial performance only, he is entitled to recover the contract price less those necessary expenditures required to complete the performance bargained for; and, if the performance falls short of being substantial, then the promisor is entitled to no recovery. See also 3 A. Corbin, Contracts §§ 700–12; 17 Am.Jur.2d Contracts § 375. Whether performance is complete, substantial, or less than substantial involves a factual determination for the trier of facts, here, the jury."

In the instant case, the district judge as the trier of the facts found a complete failure of performance on Thompson's part, and the record supports that finding. It may not be disturbed on appeal. Britz v. Consolidated Casinos Corp., 87 Nev. 441, 488 P.2d 911 (1971); Nevada Bank of Commerce v. Esquire Real Estate, Inc., 86 Nev. 238, 468 P.2d 22 (1970).

The Thompsons argue, on the basis of a quantum meruit theory, that the court erred in not awarding them damages for the work that Paul Thompson actually did on the dam and for the alleged moneys he spent in hiring certain help and buying fuel for the machinery. The basis of recovery on quantum meruit, however, is that a party has received from another a benefit which is unjust for him to retain without paying for it. Maui Aggregates, Inc. v. Reeder, 446 P.2d 174 (Hawaii 1968). However, here there was no showing of a benefit flowing from the Thompsons to the Herrmanns. As a matter of fact, the record is uncontroverted that it cost the Herrmanns $21,000 to remove the partially constructed dam because of Thompson's failure to follow the plans for its construction.[8]

---

[8]Ralph Walter Herrmann testified on direct examination by Mr. Martillaro:

"Q   Did you enter into an agreement with them [Worthington Construction Company]?

"A   Yes.

"Q   What was that agreement?

"A   That agreement was that I was to pay them $63,000.00 to build

3. The district judge awarded the Herrmanns $77,000 in damages as follows: $16,500 loan for the purchase of equipment; $16,500 personal loan; another $11,500 loan for purchase of equipment; $21,000 cost for removing the partially constructed dam; and $11,500 to cover liens filed on the property. The record clearly and adequately supports the judgment with the exception of the $11,500 award for liens, for which we find no supportive evidence. We therefore modify and affirm the judgment in favor of the Herrmanns in the total sum of $65,500.

GUNDERSON, C. J., and BATJER, ZENOFF, and THOMPSON, JJ., concur.

the same dam, plus additional funds for whatever amount that they had to remove that was in existence.
"Q   How much had to be removed?
"A   All of it.
"Q   How much did that cost?
"A   That cost over $21,000.00. The $21,000.00 would be in excess of the $63,000.00. . . ."